# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

IN RE:

APPLICATION OF OLGA KURBATOVA
FOR AN ORDER UNDER 28 U.S.C. §
1782 TO TAKE DISCOVERY FROM
CREDIT SUISSE AG

Case No. _____

# DECLARATION OF OLGA KURBATOVA

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1. My name is Olga Kurbatova. I am over 18 years of age and submit this declaration in support of the Application of Olga Kurbatova for an Order under 28 U.S.C. § 1782 to Take Discovery from Credit Suisse AG (the "1782 Application"). I have reviewed and am familiar with the 1782 Application.

2. I am the victim of a scheme that Patrice Lescaudron perpetrated at Credit Suisse SA ("Credit Suisse" or the "Bank") in Switzerland, in which improper investments were made in my securities account (the "DREAM account," which is an account controlled by me and for my benefit) that resulted in losses amounting to, at least, the equivalent of US $35 million.

3. For example, to my knowledge, Patrice Lescaudron did not provide me with accurate or truthful information about certain securities in my account either at the time of the investments or subsequently, thus leading me not to challenge the investments he had made.

4. Mr. Lescaudron then hid (starting very early in the relationship) the losses resulting from the improper investments by transferring, as I understand it, without permission, money from other customers' accounts to mine in order to compensate for the losses.

5. Aside from the inaccurate and untruthful information which Mr. Lescaudron provided me with in relation to the investments, Mr. Lescaudron hid the very serious losses that were the result of investments he had recommended. Had I known the truth about the result of such initial investments I would never have continued to trust his advice.

6. Credit Suisse claims that credits made on the DREAM account as a result of undue transfers have to be returned to the Bank; in its letter informing me—for the first time—of the existence of possible undue transfers, the Bank claimed that the total of such amounts was equivalent to CHF 34,625,444.80. Credit Suisse immediately blocked my account thereby preventing my free access to assets in my account.

7. Credit Suisse also refuses to compensate me for the losses caused by the improper investments made by Mr. Lescaudron.

8. The 1782 Application seeks discovery for use in several foreign proceedings: (i) a Swiss criminal investigation regarding forgeries of my signature purportedly by Mr. Lescaudron as part of his scheme; (ii) a Swiss criminal investigation into Credit Suisse related to the Lescaudron scheme; (iii) an appeal in the Swiss criminal case against Mr. Lescaudron where I, as a victim of his scheme, am seeking to expand the scope of the prosecutor's charges against Mr. Lescaudron (the "First Appeal"); (iv) an appeal by certain parties, including me, of the verdict ultimately rendered against Mr. Lescaudron in that same criminal case (on the narrower set of charges that the Swiss prosecutor took to trial) (the "Second Appeal"); (v) a Swiss civil proceeding against Credit Suisse that I am contemplating to seek damages in relation with the actions of Mr. Lescaudron; and (vi) a Swiss civil proceeding against Mr. Lescaudron that I am contemplating. I have retained Swiss counsel to represent me in these foreign proceedings. The accompanying declaration, discusses these foreign proceedings and their nature in more detail, and I intend to use the discovery material

2

from the 1782 Application in the ways outlined by that declaration and elsewhere in the 1782 Application.

9. The criminal proceedings described above are already ongoing and I intend to commence the contemplated civil proceedings and to submit evidence to the prosecutor in a bid to reopen the proceedings related to the First Appeal as soon as possible after receiving the full discovery from this 1782 Application and other Section 1782 discovery applications that I am filing.

10. My account at Credit Suisse is called the DREAM account, which I opened on April 26, 2005, and I am the holder of the account. The DREAM account is and always has been nondiscretionary: only my powers of attorney and I could authorize trades in the account. Mr. Lescaudron was the relationship manager for the account and was a member of Credit Suisse's Private Banking Department for Russia / Ukraine / Central Asia.

11. I have no experience in finance; neither does my staff. Therefore I never questioned the advice given by Mr. Lescaudron (who made investment recommendations to me), whom I considered, because of his position in the Bank, to be an expert in the field.

12. Moreover, I always considered the recommendations made by Mr. Lescaudron to be made under the Bank's supervision, consistent with the Bank's policies, and with the Bank's approval, after due analysis, for recommending to clients. Credit Suisse held Mr. Lescaudron out as acting under its authority.

13. Yet, it appears that for several years, Mr. Lescaudron gave me false and/or misleading information regarding the investments he was making as well as regarding the situation of my account.

14. He also made investments for my account without my authorization.

3

15. I would certainly not have trusted his advice and thus refused/challenged most of the investments he made had I known the reality of the situation (details on the investments as well as the real situation of my account).

16. I also discovered some forged documents regarding specific investments.

17. While I cannot be certain this is a full list, I believe that Mr. Lescaudron misled me about, at least, the following investments:

- Copernic Global Fund Ltd.;

- Hudson River Russia Fund (Daniloff Capital) (Hudson River Ltd.);

- Lyxor – [x3 Dynamic Leverage Fund] Certificate (issued by SGA Societe Generale Acceptance N.V., managed by Lyxor Asset Management) (ISIN XS0348154021);

- Meinl (Meinl European Land Ltd., Meinl Airports International Ltd., Meinl International Power Ltd., "Down and Out Call" Certificates relating to Meinl European Land (ISIN GB00B1WQSS64);

- Carpathian Resources Limited;

- Dynamic Leverage Certificates due 2012 linked to the Diversified Credit Suisse Portfolio 01 and issued on March 28, 2007 by Credit Suisse International (ISIN XS0276525143); and

- Principal Protected Notes due 2014 with Formulaic Dynamic Asset Allocation linked to a dedicated hedge fund portfolio ("Diversified Credit Suisse Portfolio 04"), issued on May 27, 2008 by Credit Suisse International (ISIN XS0364496165).

18. Also, I suspect that Mr. Lescaudron may have caused me to buy (i.e. take over) securities from other clients in order to relieve them from said securities and make me take on the burden of the risk of loss.

19. For example, Mr. Lescaudron invested in various MEINL securities, which sustained losses totaling EUR 9 million, I suspect without providing me with the appropriate information about the investment, including his relationships (or the Bank's relationship) with the MEINL group.

4

20. Mr. Lescaudron also invested in a very particular product without my knowledge. On May 23, 2008, for example, the DREAM bank statement shows a transaction to buy USD $15 million dollars of principal-protected notes in the Diversified Credit Suisse Portfolio 04 executed in the DREAM account, with an additional purchase of USD $1 million of the notes executing on July 24, 2008. While the reporting I was provided with did include a reference to these notes, I never gave instructions to purchase those principal protected notes in writing or orally. These notes were sold on May 28, 2009 causing a loss of over US $3 million.

21. I now understand, however, that authorizations from me for the transactions in these notes appear to exist. I did not sign any of those documents and I have no recollection of ever seeing such documents. I therefore believe them to be forgeries.

22. The Lyxor – [x3 Dynamic Leverage Fund] Certificate (the "Lyxor Product") consisted of notes representing interests in a Jersey Unit Trust (the "Fund") that sought to make leveraged investments in hedge funds. The Fund would invest up to three times its net asset value in hedge funds to seek medium-term capital appreciation. The total issuance of the Lyxor Product was $60 million, $22 million of which I now understand was held by clients of Mr. Lescaudron. Mr. Lescaudron bought the Lyxor Product for my account without my instruction and provided me with misleading information in this respect.

23. The hedge funds that the Fund invested in included multiple series of the Hudson River Russia Fund Ltd. (the "Hudson Fund"), such as Hudson River Russia Fund, Ltd. Series 03/08, Hudson River Russia Fund, Ltd. Series 05/08, Hudson River Russia Fund, Ltd. Series 08/08, or Hudson River Russia Fund, Ltd. Series 09/08. This was not apparent to me because my account statements did not indicate that the Lyxor Product was itself invested in the Hudson Fund.

5

24. This situation is problematic in part because Mr. Lescaudron also directly invested in the Hudson Fund for my account and without my permission, leaving me with outsized positions in the Hudson Fund.

25. Even worse, Mr. Lescaudron invested in the Hudson Fund after apparently performing very little diligence on it. After the revelation of the scheme, my representatives contacted Elliot Daniloff, founder of Daniloff Capital, which manages the Hudson Fund. He told us that Mr. Lescaudron had agreed to invest in the Hudson Fund after only a brief conversation and without conducting any significant due diligence.

26. I understand Mr. Lescaudron also invested for his clients' accounts in the Copernic Global Fund Ltd. (the "Copernic Fund"), which also held interests in the Hudson Fund, and stole client funds to invest further in the Hudson Fund through NFAM AG, INTRABOM, and Hudson River, entities Mr. Lescaudron created.

27. In 2008, I instructed Mr. Lescaudron to sell, amongst others, the positions in the Lyxor Product. I now understand, however, that he simply transferred funds from another customer's account to mine to give the appearance that he had been able to sell the product.

28. I also believe that many of the products in which Mr. Lescaudron invested without my consent were not recommended by the Bank or followed by the Bank for accounts such as mine.

29. Because this declaration is being submitted for a specific legal purpose, it does not contain every fact that I know that is relevant to the Swiss proceedings.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed in Moscow, Russian Federation, on this 29 day of October 2018.

_____
Olga Kurbatova

6